IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 10, 2009

### STATE OF TENNESSEE v. JOHNNY VILLALOBOS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-02508     W. Otis Higgs, Judge**

_____

**No. W2009-00449-CCA-R3-CD  - Filed April 26, 2010**

_____

A Shelby County jury convicted the defendant, Johnny Villalobos, of robbery, a Class C felony. The trial court sentenced the defendant as a Range I offender to four years in the workhouse. On appeal, the defendant contends that the evidence was insufficient to support his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Harry E. Sayle III, (on appeal), and William Johnson (at trial), Memphis, Tennessee, for the appellant, Johnny Villalobos.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Background**

On April 15, 2008, a Shelby County grand jury indicted the defendant for aggravated robbery, a Class B felony. The parties presented the following proof at a four day trial in December 2008.

*State's Proof.* Jan Francisco Segura Gonzalez, the victim in this case, testified that, around 4:00 a.m. on January 12, 2008, he was at Daniel Martinez's house when the defendant and another person asked for a ride to the apartments at Sycamore View Road and

Macon Road, which were about fifteen minutes away. Mr. Segura[1] said that he had never seen either the defendant or the other person before that day. During the drive to the apartments, Mr. Segura drove his truck, and the defendant rode in the front passenger's seat, while the other person sat behind Mr. Segura. As they approached the apartments, the defendant told Mr. Segura that they wanted his money. Once they reached the apartments, the person in the backseat drew a pistol and aimed it at Mr. Segura's head and back. They demanded that Mr. Segura get out of the truck, and the defendant turned the engine off, took the keys out of the ignition, and told his companion to kill Mr. Segura. Mr. Segura identified the defendant in the courtroom as the man who robbed him.

After he got out of his truck, Mr. Segura called his friend, Mr. Martinez, to pick him up. He and Mr. Martinez unsuccessfully looked for his truck. He did not consider calling the police because he does not speak English. Mr. Segura did not see his truck again until January 15, 2008. He identified a picture of his truck, noting that the rims were different than they had been on January 12. He also identified a picture of a weapon, which was the same shape and color of the weapon used by the defendant's companion, and a photo-lineup given to him by a police officer, on which he had circled the defendant's picture.

On cross-examination, Mr. Segura testified that he had been at Mr. Martinez's house for about thirty minutes before the defendant and his companion asked for a ride. The destination was out of his way because he lived near White Station. He was the only one of the three in the truck to get out after the defendant told him to stop. He called Mr. Martinez on his cell phone and did not recall telling anyone that he had to look for a phone to make the call. Mr. Segura said that he provided the statement he gave to the police through an interpreter. He agreed that he did not report the theft to the police until he recovered his truck on January 15. Mr. Segura explained that his friend Daniel Valles spoke English, but he did not see Mr. Valles during the time between January 12 and 15.

Mr. Segura said that he did not turn on a light inside his truck. The light from a lightpole provided enough light to see the outlines of the individuals and the weapon, but he could not see any distinguishing features of the person in the backseat other than he had darker skin than the defendant. He did not notice anything distinguishable about the man in the backseat, and he was not able to tell what clothing either man wore. Mr. Segura testified that the men did not take his wallet, but they took $500 from him. He did not recall saying anything differently at the preliminary hearing and agreed that the translator might have misinterpreted him at the preliminary hearing.

On re-direct examination, Mr. Segura said that he had not been able to identify anyone as the person with the defendant on January 12.

---

[1] This court will follow the naming conventions of the witnesses' culture throughout this opinion.

Miguel Pasillas Aguilar testified that he lived with Mr. Segura and three other individuals at 1361 Gherald Road. He had known Mr. Segura for four years. He identified a picture of Mr. Segura's Ford F-150 and stated that the truck had a unique paint job. Mr. Pasillas testified that Mr. Segura woke him up in the early morning hours of January 12 by tapping on his window. Mr. Segura's house key was on the same key ring as his truck key, which the defendant had taken, and Mr. Segura could not enter the house. Mr. Segura informed him that someone had stolen his truck.

On January 15, around 11:30 a.m., Mr. Pasillas was returning home from his job, accompanied by Javier Potee, when he saw Mr. Segura's truck traveling in the opposite direction on Airways Boulevard. Mr. Pasillas turned around and followed the truck. Mr. Pasillas testified that he followed the truck for twenty to twenty-five minutes and called a friend, "Danny," who spoke English so that "Danny" could call the police. Mr. Pasillas testified that he got a good look at the driver of the truck because when he pulled alongside the truck, the window was down, and Mr. Pasillas yelled for the driver to stop. Mr. Pasillas said the driver was the only person in the truck. He identified the defendant as the driver of the truck. The defendant stopped the truck in the neighborhood, got out, and ran away. Mr. Pasillas and Mr. Potee returned the truck to Mr. Segura and Mr. Pasillas' residence. When the police arrived at the residence, they had the defendant in the back of a patrol car.

On cross-examination, Mr. Pasillas confirmed that Daniel Valles called the police for him after they saw Mr. Segura's truck. He saw four patrol cars in the area after they retrieved the truck. Mr. Pasillas said that Mr. Segura told him on the morning of the robbery that he and Daniel Martinez were going to call the police. Mr. Pasillas said that on January 15, when he told the defendant to get out of the truck, they were both in their vehicles but had stopped the vehicles and had the windows down. Mr. Pasillas testified that they were not driving at high speeds and denied that either he or Javier Potee fired a gun. He clarified that, when following Mr. Segura's truck, he called his roommate, Hosea, so that Hosea could call Daniel Valles, who spoke English. He did not personally speak with Daniel Valles until they had recovered the truck and returned to 1361 Gherald Road, at which time Daniel Valles called 9-1-1 from his cell phone. On re-direct examination, Mr. Pasillas testified that neither he nor Mr. Potee were armed on January 15.

Jessica Matlock testified that she lived at 4255 Bayliss Avenue with her mother, stepfather, and her two young children. She was standing on her front porch on January 15, 2008, when police officers approached her, asking whether she had seen anything suspicious. When she replied that she had not, they told her to watch out for an armed and dangerous man. Ms. Matlock testified that she had not heard any gunshots that day nor seen anyone running through her neighborhood. After the police left, she went inside to let her dogs go out into the fenced yard. She noticed that the dogs went straight to the garage, and then she

saw that the door to the garage was open. Ms. Matlock called 9-1-1 because the door was not normally left open, and she believed the man for whom the police were looking was in her garage. The police arrived about three minutes after she called 9-1-1 and asked her take the dogs inside and lock the doors. Ms. Matlock said that after a couple of minutes, the police asked her to come to the garage so that she could tell them whether a gun that was lying on her son's swing belonged to her children. She said that it did not. Ms. Matlock testified that the police were walking a man out of the garage, and she identified the defendant as that man. Ms. Matlock said that neither her children nor anyone else in her household owned a toy gun like the one the police found in her garage. She said she would not let her children play with a toy like that because "[i]t looked to [sic] real."

On cross-examination, Ms. Matlock recalled that this all occurred between 8:00 and 10:00 a.m. She had not been in the garage since Christmas morning, but her stepfather went into the garage one to two times a week. Ms. Matlock said that she thought the gun shown to her by police was a real weapon until they told her it was a toy.

Officer Richard Morrow of the Memphis Police Department testified that he responded to a call that there had been a carjacking with shots fired. He was the third car to arrive at Ms. Matlock's house. He and his partner entered the garage, identifying themselves as police officers and ordering anyone inside to come out, receiving no response. Because it was dark in the garage, Officer Morrow used his flashlight to pan the area and saw what appeared to be an automatic handgun on a child's swing. Officer Morrow said that the defendant was within an arm's length of the gun. He warned the defendant not to reach for the gun or risk being shot. The defendant crawled towards him, and Officer Morrow's partner handcuffed him while he "kept him at gunpoint." After exiting the garage, Officer Morrow informed his lieutenant that a weapon had been recovered and "to start crime scene." He testified that he initially believed the gun to be real until he tapped it with his pen and realized it was plastic. Officer Morrow said that the toy gun looked almost identical to the forty caliber weapon he carries and did not have an orange tip "that's supposed to have been on that gun . . . ." After taking the defendant into custody, Officer Morrow secured the scene while the crime scene unit began processing the area.

Officer Morrow testified that, before they found the defendant, he spoke with a male Hispanic in a white truck "stopped a block away from where the [blue] truck had wrecked out." The man spoke very little English, and Officer Morrow spoke very little Spanish, but Officer Morrow said he was able to communicate why he was in the area. The male Hispanic was not at the garage at any time, nor were any other Hispanics. Officer Morrow testified that he did not do a show-up, where a suspect is physically taken in front of a witness or victim, in this case. He further testified that Mr. Segura was in the vicinity of the white truck a few minutes after the police made the scene. Later, on re-direct examination, he clarified that Mr. Pasillas was the man by the white truck. The defendant was not in the

vicinity at that time. Officer Morrow said that he searched the white truck before they went to 4255 Bayliss Avenue and did not find any weapons, shell casings, or live rounds. He also said that he did not find anything consistent with a recently fired weapon nor did he find any casings around the area where the two trucks were parked.

On cross-examination, Officer Morrow testified that he responded to a shots-fired call at Holliday Street and Riviera Drive, about two blocks from Ms. Matlock's home on Bayliss Avenue. He stopped a white truck that was leaving the area where a blue truck had crashed. Officer Morrow said there was one occupant of the vehicle, a male Hispanic, but he could not remember the man's name. When asked whether he had a pistol, the man responded in broken English that the man who was running away had a pistol. The man said he had been looking for the person driving the blue truck and gave his consent for the police to search the white truck. Officer Morrow later learned that the blue truck was involved in a robbery. The man, gave a description of the person who was running away. Officer Morrow said that the description of the man and what he was wearing was broadcast to other officers, but he was unsure if all the information came from the man with the white truck because other people were around.

Officer Robert Whipple, of the Memphis Police Department, testified that on January 15, 2008, he received a "shots fired, suspicious vehicle call" in the vicinity of Gherald Road and Riviera Drive. When he arrived at the intersection, he observed three or four Hispanic males around a truck with a two-tone paint job parked in the intersection. Officer Whipple testified that he spoke some Spanish and was able to converse with the men. One man told him that someone had taken the vehicle in a car-jacking a few days before, and the suspect bailed out of the truck and ran. The man was the car-jacking victim's roommate; the victim was not present. Another man present spoke English and gave Officer Whipple a description of the suspect, which Officer Whipple broadcast to the patrol cars in the area. While he was with the men, he did not see any shell casings or anyone who was armed, nor did he smell any gun powder. He took down the VIN number of the truck and the tag number. Within a short time after sending the broadcast, he heard over the radio that other patrolmen had taken a suspicious man hiding in a garage on Bayliss Avenue into custody and had found a weapon. When Officer Whipple arrived at the residence on Bayliss Avenue, he took custody of the gun, which the officers had discovered was a toy, and the defendant. He transported both to the Criminal Justice Complex at 201 Poplar Avenue.

On cross-examination, Officer Whipple testified that he was three to four blocks away when a call came of either shots fired or a suspicious vehicle. He said that he called in the VIN and tag numbers of the two-tone truck, and the reply was that no one had reported the truck stolen. Officer Whipple estimated that the intersection where the truck was parked was one block away from 4255 Bayliss Avenue. He recalled seeing a white truck parked further down Riviera Drive but could not remember which way it was facing. He made no inquiries

about the white truck. Officer Whipple said that he wrote down the names of the men with the truck on a notepad because they were witnesses, and he turned the notepad over to the investigator. He said that Sergeant Taylor and Sergeant Lundy were the investigators on the scene that day, and Sergeant Taylor, assigned to the Safe Streets Task Force, generally responds to "[a]ny type of violent . . . street crimes."

Robert Winston testified that, as a fingerprint examiner for the Memphis Police Department, he examined the plastic pistol found in the garage at 4255 Bayliss Avenue. He did not find any fingerprints or any evidence that someone had wiped prints off of the pistol.

Sergeant James Taylor, of the Memphis Police Department's Safe Streets Task Force, testified that on January 15, 2008, he heard that officers were involved in a chase near Gherald Road, so he drove to the scene on Gherald Road where Officer Whipple was speaking with Mr. Pasillas. While Sergeant Taylor was on the scene, other officers arrested the defendant and brought him to Gherald Road, where Mr. Pasillas identified him as the man who had been driving Mr. Segura's truck. At that time, the defendant told Sergeant Taylor that he had been in the truck, but he had found the truck in front of his house, parked with the keys inside.

Sergeant Taylor testified that he first met Mr. Segura at the robbery office at 201 Poplar on the afternoon of January 15. Mr. Segura was not at Gherald Road when the officers brought the defendant to that location. Sergeant Taylor spoke with Mr. Segura through an interpreter. Mr. Segura reported that someone had robbed him at gunpoint and said that the gun was black. Sergeant Taylor prepared a photo-lineup, and the interpreter translated the police department's guidelines regarding lineups for Mr. Segura. Mr. Segura identified the defendant.

Sergeant Taylor then interviewed the defendant after advising him of his rights. The defendant did not need a translator because he spoke English. The defendant told Sergeant Taylor that he found the truck and began driving around until people started chasing him. After Sergeant Taylor advised the defendant that Mr. Segura had identified him as the man who robbed him at gunpoint, the defendant requested a lawyer, and the interview ceased. Sergeant Taylor next attempted to discover who reported that shots were fired but was unsuccessful. He testified that "[he] attempted to locate the 9-1-1 calls, or any kind of phone calls to police communications, but there were none documented."

On cross-examination, Sergeant Taylor testified that he pulled the computerized dispatch log, which listed an "unknown caller." He did not pull the 9-1-1 audio recordings due to the number of calls made on January 15. Sergeant Taylor generated a robbery report after speaking to Mr. Segura, and he said that it is not unusual for people to not immediately file police reports. Sergeant Taylor said that Mr. Segura made his written statement through

the interpreter, which was noted on the statement. Regarding the photo-lineup, Mr. Segura made the identification in under a minute and wrote, in Spanish, on the form, "The guy told the other guy to shoot me, he took me out of the truck, he told me to give him the money and he told me we're going to kill you." Sergeant Taylor testified that he became involved in the case because it was a car-jacking.

On re-direct examination, Sergeant Taylor testified that he had an opportunity to examine Mr. Segura's truck and found that all the glass was intact. Additionally, there were no bullet holes nor "anything consistent with gun play."

*Defense Proof.* Beverly Davis, an employee of the Memphis Police Department, testified that she works in the 9-1-1 dispatch office and keeps the records for the office. She identified an "event chronology print out of 9-1-1 calls," testifying that the print out included three events that corresponded to a recording of three 9-1-1 calls. The court admitted the 9-1-1 recording into evidence, and defense counsel played the recording for the jury. Ms. Davis testified that the first call on the recording occurred at 11:54 a.m. on January 15, 2008; the second call on the recording occurred at 11:52 a.m. on January 15; and the third call occurred at 12:07 p.m. on January 15. The 11:54 a.m. call and the 12:07 p.m. call both included call-back numbers, but the 11:52 a.m. call did not include a call-back number, and the caller did not identify his or herself.

On cross-examination, Ms. Davis testified that only one 9-1-1 dispatcher spoke enough Spanish to carry on a conversation. Dispatchers transfer callers who speak languages other than English to a language line. Ms. Davis agreed that the person who called at 11:54 a.m. appeared to be a Hispanic male, and people were speaking Spanish in the background. The person who called at 11:52 a.m. identified herself as Markeasha's mother, and Ms. Davis said that Markeasha is a woman who works in the office. Markeasha's mother called on a service line rather than calling 9-1-1. Ms Davis did not know Markeasha's mother's actual name but knew that she was a mail carrier. Ms. Davis agreed that no gunshots could be heard on any of the three calls.[2] On re-direct examination, Ms. Davis testified that the language line is always open so that anyone speaking any language can report a crime at any time.

Lula Farr testified that she is a mail carrier for the United States Postal Service and delivers mail in the Nutbush community. On the morning of January 15, 2008, while Ms. Farr was delivering mail near Riviera Drive and Holliday Street, she saw a white truck chasing a blue truck until the blue truck stopped on the sidewalk, and the driver jumped out and ran. She saw another car come from a different street as well. Ms. Farr said one of the occupants of the white truck got into the blue truck and drove away. As she was delivering

---

[2] Jessica Matlock made the third call at 12:07 p.m.

the mail on Riviera Drive, she met a man walking towards her, and then she saw the same white truck, with two occupants, coming down the street. Ms. Farr testified that the driver of the white truck began shooting, and the man who had been walking ran away. She did not know how many shots that the driver fired. She called the service line for the 9-1-1 bureau, identified herself as Markeasha's mother, and told them about the shooting. Ms. Farr stayed on Riviera Drive until she spoke with the police. On cross-examination, Ms. Farr testified that when she called the 9-1-1 bureau, she said that she thought the man who was on foot must have tried to steal the truck belonging to the people who were chasing him "[b]ecause the[] guys were chasing the truck and then another car . . . came to cut him off and he ran up on the sidewalk and jumped out and just took off running."

The defendant testified that in January of 2008, he lived in the Nutbush community. On January 12, 2008, he was at his home when his friend, David, received a call from a prostitute requesting that he and David come to a house on Wells Station Road[3] to sell her and others some cocaine. He and David went to the house between 12:30 and 1:00 a.m., and two Hispanic men and two Caucasian women were present and purchased cocaine. A couple of hours later, two more Hispanic men arrived, one of whom was Jan Segura. The defendant said that Mr. Segura purchased $80 worth of cocaine from him and spent some time with one of the prostitutes. Mr. Segura later returned to him wanting to purchase more cocaine but did not have any money. Mr. Segura said that he would be paid the following day, a Saturday. Upon the defendant's request for collateral, Mr. Segura gave the defendant his truck keys and described which vehicle was his. Mr. Segura used the cocaine he purchased and then asked the defendant for a ride, which the defendant refused. Mr. Segura left with another man in search of more cash, and he did not return before the defendant left. The defendant told the others present in the house where he lived so that Mr. Segura could reclaim his truck. The defendant said the truck stayed in his driveway until Tuesday, when he gave his girlfriend a ride to Summer Avenue.

On the return trip, the defendant noticed a small white truck following him. Eventually, the white truck pulled alongside the defendant, and the passenger rolled down his window. The defendant responded by rolling down his window as well, at which point, the defendant testified that the driver was holding a gun and yelled at the defendant, in Spanish, to stop the truck. The defendant tried to accelerate the truck, but the truck began stalling, so he pulled the truck over and jumped out. He ran through some yards when the white truck began following him. When he reached another street, the occupants of the white truck fired two shots at him. The defendant testified that, as he was climbing over a fence, there were three more shots. He saw Mr. Pasillas in the driver's seat of the truck at that point, and Mr. Pasillas fired three more shots. The defendant said that he had never seen Mr. Pasillas before that time. The defendant testified that he entered a garage to hide. When the

---

[3] On cross-examination, the defendant said that the house was on White Station Road.

police arrived, the defendant yelled that he was in the garage, and he came out of the garage as instructed by the police.

The defendant testified that he did not make any statement to Sergeant Taylor about finding the truck. He recalled that Sergeant Taylor advised him of his rights, and he agreed to speak with Sergeant Taylor as long as he had an attorney present. The defendant said that Sergeant Taylor became angry and

> showed [him] a badge, some kind of [f]ederal badge that he had[,] and he said, 'Look here, do you see this, this is a [f]ederal badge[;] I'd advise you to talk to me[.] [I]t is in your best interest to talk to me[.] [I]f you don't[,] I'm going to give you ten years in the Feds[;] I can do that.

The defendant responded that he wanted an attorney present, which ended the conversation. The defendant denied ever having been in a vehicle with Jan Segura. He did not ask Mr. Segura for a ride, and his friend never pulled a gun on him.

On cross-examination, the defendant said that the house where he sold cocaine on January 12 was on White Station Road. He agreed that he had a cell phone with him when he was hiding from Mr. Pasillas but did not call police. The defendant said that Mr. Pasillas fired five shots in total. He denied that the toy gun in the garage was his. He testified that he could not own a gun because he was a convicted felon. The defendant agreed that he had been convicted in New Mexico of possession of one hundred pounds of marijuana.

*State's Rebuttal Proof.* Richard Wing testified that he was Ms. Matlock's stepfather and lived with her at 4255 Bayliss Avenue. Mr. Wing said that he works on his motorcycle in the garage at his residence and frequently spends time there. He testified that, before January 15, 2008, he had never seen the toy gun that the police found in the garage. Neither he nor his family members owned anything like it. On cross-examination, Mr. Wing testified that two windows in the garage provide enough light during the day to work by.

After deliberations, the jury found the defendant guilty of the lesser-included offense of robbery, a Class C felony. The trial court sentenced the defendant as a Range I, standard offender, to four years in the workhouse. The defendant filed this timely appeal.

**Analysis**

On appeal, the defendant claims that the evidence was insufficient to support his conviction for robbery. Specifically, he argues that the record does not support his conviction beyond a reasonable doubt because of the fact that Mr. Segura did not report a robbery and the inconsistency between Mr. Pasillas' and Ms. Farr's testimony.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e).

In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

To sustain the defendant's conviction for robbery, the state was required to prove that the defendant committed an intentional or knowing theft of property from the person of another by violence or putting the person in fear. *See* Tenn. Code Ann. § 39-13-401(a). Viewing the evidence in the light most favorable to the state, we conclude that the evidence was sufficient to support the defendant's conviction for robbery. The evidence established that in the early morning hours of January 12, 2008, the defendant and a companion requested a ride in Mr. Segura's truck, and when they reached their destination, the defendant demanded that Mr. Segura give him his money and get out of the truck. The defendant's companion held a gun to Mr. Segura's head, which Mr. Segura testified made him feel afraid, and the defendant discussed killing him. Testimony at trial revealed that Mr. Segura reported the robbery to his roommates, but he did not report it to the police until after Mr. Pasillas saw the defendant driving the stolen truck, which Mr. Pasillas recovered after the defendant abandoned it. Whether Mr. Pasillas shot at the defendant or not is inapposite to the defendant's conviction for robbery because the robbery occurred three days prior to the recovery of the truck. Mr. Segura identified the defendant in a photo-lineup as the man who took his money and truck, and he identified him again in court. The jury resolved the

questions of fact in favor of the state, and we conclude that the evidence was sufficient to sustain their verdict that the defendant was guilty of robbery beyond a reasonable doubt. The defendant is without relief.

## Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE